## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| v. | * | |
|  | * | CRIMINAL NO. PX 19cr 77 |
| **YOSEF HERZOG a/k/a "Yossi Herzog,"** | * | |
| **NISSIM ALFASI a/k/a "Nick Onasis," ELAD BIGELMAN a/k/a "Michael Goldberg,"** | * | **(Conspiracy to Commit Wire Fraud, 18 U.S.C. § 1349; Wire Fraud, 18 U.S.C. § 1343; Aiding and Abetting, 18 U.S.C. § 2; Forfeiture, 28 U.S.C. § 2461, 18 U.S.C. § 981, 21 U.S.C. § 853)** |
| **Defendants.** | * | |

\*\*\*\*\*\*\*

### INDICTMENT

The Grand Jury for the District of Maryland charges that at times material to this Indictment:

### GENERAL ALLEGATIONS

#### Relevant Entities

1.    BinaryBook and BigOption sold and marketed financial instruments known as "binary options." BinaryBook and BigOption sold and marketed binary options to customers located throughout the world, including in the United States and within the District of Maryland.

2.    Linkopia was a Mauritius-based business that provided sales and marketing services known as "conversion services" on behalf of BinaryBook and BigOption through the use

of communications by email and by phone to individuals in the United States, including in the District of Maryland, and elsewhere throughout the world.

      a.    "Conversion services" were services provided with the objective of converting a prospective binary options customer into an investor and obtaining an initial deposit of funds.

      b.    A "conversion agent" or "conversion representative" was a salesperson responsible for performing conversion services.

3.    Yukom Communications was an Israel-based business that provided sales and marketing services, including "retention services," on behalf of BinaryBook and BigOption through the use of communications by email and by phone to individuals in the United States, including in the District of Maryland, and elsewhere throughout the world.

      a.    "Retention services" were services provided with the objective of obtaining additional deposits from investors who had previously made deposits.

      b.    A "retention agent" or "retention representative" was a salesperson responsible for performing retention services.

      c.    Retention representatives sometimes referred to themselves as "brokers" or "traders" to potential investors.

**<ins>The Defendants</ins>**





2



5.      Defendant **YOSEF HERZOG**, a/k/a "Yossi Herzog," was a resident of Israel. From at least in or about May 2014 through at least in or about September 2017, **HERZOG** was the owner of Linkopia.  From in or about May 2014 through in or about December 2016, **HERZOG** was the owner of Yukom.  **HERZOG** supervised the managers of Yukom, Linkopia, BigOption, and BinaryBook, including ███████ **ALFASI, BIGELMAN,** ███████ and others.



7.      Defendant **NISSIM ALFASI**, a/k/a "Nick Onasis," was a resident of Israel.  From at least in or about July 2014 through at least in or about February 2017, **ALFASI** was an employee of Yukom, where he served as a brand manager for BinaryBook.  In correspondence and other communications, **ALFASI** identified himself as "Branch manager" for BinaryBook and "Account Manager and Senior Broker" for BigOption.  **ALFASI** supervised representatives of BinaryBook

who performed retention services.   **ALFASI** also performed retention services on behalf of BinaryBook.

8.      Defendant **ELAD BIGELMAN**, a/k/a "Michael Goldberg," was a resident of Israel.   From at least in or about January 2015 through at least in or about September 2017, **BIGELMAN** was an employee of Yukom, where he served as a brand manager for BigOption. In correspondence and other communications, **BIGELMAN** identified himself as "Account Manager" for BigOption. **BIGELMAN** supervised representatives of BigOption who performed retention services on behalf of BigOption.   **BIGELMAN** also performed retention services on behalf of BigOption.



12. 

### **Binary Options**

13.     A binary option was a type of option contract in which the payout depended on the outcome of a discrete event, typically related to whether the price of a particular asset—such as a stock or a commodity—would rise above or fall below a specified amount.  Unlike standard options, investors in binary options were not being given the opportunity to actually purchase a stock or a commodity but, rather, were effectively predicting whether its price would be above or below a certain amount at a certain time of the day.  The option holder was typically promised that when the binary option expired, the option holder would receive either a pre-determined amount of cash or nothing.

14.     While some binary options were listed on registered exchanges or traded on a designated contract market that were subject to oversight by U.S. regulators such as the Securities and Exchange Commission (SEC) and the Commodity Futures Trading Commission (CFTC), neither BinaryBook nor BigOption sold binary options that were traded on a legal and regulated designated contract market in the United States.

### **Other Related Definitions**

15.     A "bonus" was an amount of purported funds that representatives of BinaryBook and BigOption could contribute to an investor's account to be used in trading.

16.     "Bonuses" were accompanied by burdensome "turnover" requirements—such as requiring that investors trade 30 times the amount in their account before they could withdraw

funds—but investors were more likely to lose their money over time as they increased their trading activity.

17.    A "risk free trade" or "insured trade" was a trade offered by representatives to investors in which the investors' accounts would be reimbursed by "bonus" funds in the event of a losing trade.

18.    A "chargeback" was the reversal of a credit card charge due to an allegation of fraud by the cardholder.

19.    A "payment service provider" was a third party company that processed investor deposits or payments.

### Victims

20.    Victim A, an investor in BinaryBook, was a resident of Gaithersburg, Maryland, located in the District of Maryland.

21.    Victim B, an investor in BigOption, was a resident of Laurel, Maryland, located in the District of Maryland.

22.    Victim C, an investor in BinaryBook, was a resident of Annapolis, Maryland, located in the District of Maryland.

23.    Other victims included Victims D through H.

### COUNT ONE
### (Conspiracy to Commit Wire Fraud)

The Grand Jury for the District of Maryland further charges that:

24.    Paragraphs 1 through 23 are realleged and incorporated herein by reference.

25.    Beginning in or about May 2014 and continuing through in or about September 2017, the exact dates being unknown to the Grand Jury, in the District of Maryland and elsewhere, the defendants,



█████ █████ **YOSEF HERZOG,** ████ █████
**NISSAM ALFASI, ELAD BIGELMAN,** ████ ███ ,
█████████████ ████ ████ ██ ████ ,

and others known and unknown to the Grand Jury, did knowingly and willfully combine, conspire, confederate, and agree with each other and others, both known and unknown to the Grand Jury, to commit wire fraud, that is, knowingly and with the intent to defraud, having devised and intending to devise, and willfully participated in, a scheme and artifice to defraud binary options investors in BinaryBook and BigOption and for obtaining money and property by means of materially false and fraudulent pretenses, representations and promises, knowingly transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, pictures, and sounds for the purpose of executing the scheme and artifice in violation of Title 18, United States Code, Section 1343.

### Purpose of the Conspiracy

26.     It was the purpose of the conspiracy for the defendants and their co-conspirators to obtain the maximum deposit from investors and to take steps to ensure that investors lost the money in their accounts or were otherwise unable to withdraw funds—thereby making money for themselves and their brands in the process.

### Manner and Means of the Conspiracy

27.     The Defendants and their co-conspirators induced investors to deposit funds based on misrepresentations, including:

a.     false statements and material omissions regarding the alignment of financial incentives between investors and representatives;

b.     false statements and material omissions regarding the suitability of binary options as investments and returns on investments in binary options;

c.       false statements and material omissions about the names, qualifications, and physical location of representatives assisting investors; and

d.       false statements and material omissions regarding investors' ability to withdraw investment funds and about the reasons that funds could not be withdrawn.

28.     Representatives of BinaryBook and BigOption also made false statements and material omissions related to—and engaged in the deceptive use of—so-called "bonuses," "risk free trades," and "insured trades."

29.     The defendants' co-conspirators included Managers A through D, who supervised employees of BinaryBook and BigOption, and Representatives A through P, who also worked as salespeople for BinaryBook and BigOption.

30.     The conspiracy resulted in worldwide investor losses in excess of $145 million.

*False Statements and Material Omissions*
*Regarding the Alignment of Financial Incentives Between*
*Investors and Representatives of BinaryBook and BigOption*

31.     The defendants and their co-conspirators made or caused materially false statements and failed to disclose material information to binary options investors about whether the financial incentives of representatives of BinaryBook and BigOption were aligned with binary options investors.  For example:

a.       On or about July 16, 2014, ▇▇▇▇▇▇ emailed Victim D and told him that "I want to work whit [sic] your account in bring it hi [sic] has [sic] we can."

b.       On or about January 28, 2015, **BIGELMAN** emailed Victim E and stated that "my job is to make sure your account will be profitable so we both will make money here."

c.       On or about March 3, 2016, **ALFASI** spoke with Victim F by telephone and stated that "our job is to make sure that you're making money."

8

32.     Representatives of BinaryBook and BigOption, working under the supervision of ███████HERZOG, ██████████ALFASI, BIGELMAN, ████████, and others known and unknown to the Grand Jury, claimed to be representing the interests of investors when, in fact, they were not representing the interests of investors.

33.     In fact, when investors lost money, ████████████HERZOG, as the owners of BinaryBook and BigOption, profited, and retention representatives of BinaryBook and BigOption at Yukom and elsewhere received commissions based on net investor deposits (*i.e.*, investor deposits minus withdrawals), not investor profits. In other words, retention representatives were incentivized to maximize deposits and minimize withdrawals.

34.     **HERZOG,** ██████████**ALFASI, BIGELMAN,** ████████and others trained and encouraged representatives of BinaryBook and BigOption at Yukom and elsewhere to make such claims. For example:

        a.      On or about June 11, 2014, ████████ circulated email "templates" to be used with customers to ████████ and Manager A that included various representations, including "I would like to discuss about your investment so that you understand how BigOption can help you achieve financial success"; "we, at BigOption, have come up with two amazing offers, which give you the opportunity to maximize profits and reduce losses at the same time"; "you always have a winning hand with BigOption"; and "wishing you a successful trading experience!" This email was later forwarded to ████████.

        b.      On or about June 29, 2014, Manager B circulated to all retention agents, as well as **ALFASI, HERZOG,** ██████████████████, a sample of a "mass email to all customers." The email was titled "BigOption Learning Camp" and advertised that investors could "learn the trading tools and strategies that will help you make winning

trades." It also stated that "this is your chance to enhance your knowledge and earn more profits!"

      c.    On or about May 25, 2015, Representative A emailed a "Call script" to ▮▮▮▮▮▮▮ The "script" included various representations to be made to investors, including that "I'm not here to make you rich in one day or one week - I'm here to make sure that your financial future in trading is secure."

      d.    On or about February 25, 2016, Representative B, who was in charge of training at Yukom, emailed a "Call script" to ▮▮▮▮▮**ALFASI, and BIGELMAN**. The "script" included various representations to be made to investors, including that "I am only here to help you generate the profit you want to achieve" and that "my company is very interested in helping you generate the biggest possible profit in the account."

      e.    On or about June 6, 2016, Representative B emailed a similar "Call script" to Representative C that included various representations to be made to investors, including that "I am only here to help you generate the profit you want to achieve" and that "my company is very interested in helping you generate the biggest possible profit in the account."

      f.    On or about July 18, 2016, Representative D emailed a similar "Call script" to **BIGELMAN**. The "script" included various representations to be made to investors, including "basically, my job is to make sure that you make as much money as possible" and that "you see, I have two jobs here, one is to make you money. The other is to make you feel comfortable."

      g.    On or about August 23-24, 2016, Manager A corresponded with Representative E about an upcoming training course for other representatives. On or about

August 23, 2016, Representative E sent an email to Manager A and Manager C regarding and attaching a "Course Manual." On or about August 24, 2016, Representative E sent an email to Manager A, Manager C, and Manager D regarding and attaching a "REVISED" manual. The "Course manual" attached to the email sent by Representative E on or about August 24, 2016, included a section on addressing "Investor Objections," including objections about "Results," and advised representatives that they could state, "We have a mutual goal here, to make you profits. When you make money, I make money."

h.    **ALFASI** saved a script in his Google Drive entitled "MANY REBUTTALS" that included a series of potential objections from investors and included instructions on how to respond. The document advised that if someone was questioning how the representative was making money, one potential response was that "I get 1% from all my traders that I help them open an account , so once you start to make profit , I will make profit  as well [*sic*]." Representatives were also advised that they could represent "when you make money , we make money . When you don't make money , we actually lose money [*sic*]."

35.    Furthermore, the trading system used by investors of BigOption and BinaryBook could be manipulated to affect the likelihood of an investor being able to profit on the platform, with the "high risk" setting for an account being used to adversely impact the investor's ability to profit on trades. The defendants and their co-conspirators used the "high risk" setting from time to time in order to prevent an investor from profiting.

36.      ████████ HERZOG, ████████ ALFASI, BIGELMAN, ████████ and others trained and encouraged representatives of BinaryBook and BigOption at Yukom and elsewhere to maximize investor deposits.  For example:

a.      On or about May 20, 2015, **BIGELMAN** wrote to BigOption retention representatives concerning the process of "reassigning [investor] leads."  **BIGELMAN** wrote that because "a few people [had] left the company," their "portfolio's [*sic*]" were being "reassign[ed]."  **BIGELMAN** went on to state that "[y]our job is to call them and to tell the CM [*i.e.*, customer] that the previous broker got promoted and you are going to handle the account for them."  **BIGELMAN** further advised that representatives should "not try to take money from them on the first call, unless they really want to," and that "[t]here is a lot more money to take from these people."

b.      On or about September 29, 2015, Representative H sent an email to other representatives regarding a sales "marathon" in which representatives would compete with one another and be rewarded based upon their ability to obtain investor deposits.  Representative H commented in the email, "This is not cemetery here!  It's a boiler room!  . . . . DON'T LEAVE THE MONEY!  JUST TAKE IT!"

c.      On or about November 6, 2015, Representative H sent an email to other representatives concerning their employment responsibilities.    According to Representative H, these responsibilities included "to squeeze and up-sale the investor."

d.      On or about December 14, 2015, Representative I emailed **BIGELMAN** and ████████ and asked that an investor's settings in the system be moved to low risk (meaning that he had a higher chance of winning trades) because "IT'S A CLIENT THAT

HAS MONEY AND WITH SOME SUPPORT I COULD GET HIM FOR A BIG AMOUNT."

      e.     On or about January 26, 2016, Representative J advised other representatives about the use of an "Academy" training session, which was marketed to investors as an educational program designed to improve their ability to successfully trade on their own. Representative J advised others to "[r]emember that the goal is to get them addicted to the platform and having them trade more volume."

      f.     On or about April 7, 2016, **BIGELMAN** sent an email to Representative K with the subject line "hey buddy good job, so far for today!!!!!!!  Keep up the good work!!!!!!!!!!!"  The text of the email included "YALA COME ON, PUSH PUSH PUSH TAKE EVERYTHING THEY GOT."

### *False Statements and Material Omissions Regarding the Suitability of Binary Options as Investments and Investment Returns*

    37.    The defendants and their co-conspirators made or caused materially false statements and failed to disclose material information to binary options investors about the suitability of their investments and about the expected returns on their investments. For example:

      a.     On or about June 29 through July 7, 2014, ▮▮▮▮▮ emailed Victim D and made various representations, including "I believe that by the end of the month I will make you 20% - 30% on your account" and that "the average client at [the Elite Trader Group] level could see monthly profits in the $5,000 to $7,000 range."

      b.     On or about January 26 through January 28, 2015, **BIGELMAN** emailed various investors about signing up for a "managed account," which would involve **BIGELMAN** "making .sure [sic] we will make about 15% - 20% profits a month."

13

c.      On or about February 10, 2015, Victim H emailed **BIGELMAN** and asked, "what is your track record on making 15 – 20% profit on the account?" **BIGELMAN** responded, "the min[imum] that we make is 15% a month."

38.      ███████**HERZOG,** ████████**ALFASI, BIGELMAN,** ███████, and others trained and encouraged representatives of BinaryBook and BigOption at Yukom and elsewhere and caused such representatives to be trained to make such misrepresentations.  For example:

a.      On or about July 30, 2015, ████████ internally circulated an email template to be used with investors.  The email was titled "Trading results" and included a chart of purported trading results from 2015.  The email included representations such as claiming an "81% winning rate" and that "we always have great trades for our group and this makes each investor rich, calm and happy."

b.      On or about November 18, 2015, Representative L emailed **BIGELMAN** and Manager A asking them to "tell me what you think of the below email."  The "below email" was a draft email titled "Take Care Of Our Future!!" and included representations regarding a purported trading opportunity such as "I believe this kind of opportunity won't come twice. Let's think about it together, where else can we have a return on our investment of 75% in a period of 4 months?? In the bank? Yeah right… maybe 4% yearly."

c.      On or about November 30, 2015, Representative M emailed ████████ **and BIGELMAN** asking for "thoughts" on "[m]ail I sent to clients."  The email was titled "BigOption - Pension = safe?" and included representations such as "if you want your savings, pension and retirement money to be safe! All you need to do is to put it in binary account."

    d.    The "Call script" circulated to ████████ ALFASI, and BIGELMAN by Representative B on or about February 25, 2016, advised other representatives to inform investors that they "manage around 80 clients which are generating a profit of between 15 – 25 % on a monthly basis"; that they have an "average success rate of 70%" that would yield a "profit of 19%"; and that "the more funds we have in your account – the bigger the profit."

    e.    The "Call script" circulated on or about June 6, 2016 by Representative B to Representative C similarly advised other representatives to inform investors that they "manage around 80 clients which are generating a profit of between 15 – 25 % on a monthly basis"; that they have a "track record, (success rate) [*sic*] which is 70%" that would yield "an average profit of 19%"; and that "the more funds we have in your account – the bigger the profit."

    f.    The "Course manual" sent to Manager A by Representative E on or about August 24, 2016, included a section containing a "SPEECH" to be given to investors that included various representations, including that "[t]his account will allow [*sic*] to see much higher proceeds than any form of bank in the financial market.  (70%-80% Profit per trade)."  The same "SPEECH" included the representation that "[t]oday I manage around 80 investors which are generating a profit of 15%- 25% on a monthly basis"; that "[t]he way I achieve it for my investors is by relying on a track record of 70%, which means that for each 10 trades, at least 7 will be in the money"; and that "[m]oney makes money, and the more funds you have in your account– the bigger the profit you will be able to make."

g.    **ALFASI** saved a script in his Google Drive entitled "how to work attitude" that advised representatives to state that a purportedly available binary options trading software had "up to 87% success rate."

### False Statements and Material Omissions Regarding the Names, Qualifications, and Physical Location of Representatives

39.    The defendants and their co-conspirators made or caused materially false statements and failed to disclose material information to binary options investors about the true names, qualifications, and physical location of representatives of BinaryBook and BigOption who were purporting to assist investors.

40.    For example, ████ ██ ██ ██ ██ ████ ████ ██ ██ ██ ████ ██████**ALFASI** used the alias "Nick Onasis," and **BIGELMAN** used the alias "Michael Goldberg," including when interacting with investors.  Such aliases were referred to internally within Yukom, Linkopia, BinaryBook, and BigOption as "stage names," and Manager A approved these "stage names."

41.    Representatives of BinaryBook and BigOption at Yukom and Linkopia would falsely claim to be located in the city of London in the United Kingdom, including through the use of phone numbers provided to investors with area codes associated with the United Kingdom.

42.    ████**HERZOG,** ████ **ALFASI, BIGELMAN,** ████, and others trained and encouraged representatives of BinaryBook and BigOption at Yukom and elsewhere and caused such representatives to be trained to make such misrepresentations.  For example:

a.    The "Call script" sent to ████, **ALFASI, and BIGELMAN** by Representative B on or about February 25, 2016, advised other representatives to tell investors, "as you can probably hear on my voice, I'm not British originally, [*sic*] I'm actually from XXX and I moved to London XXX years ago to complete my Master's

degree in Economics from XXX." The "Call script" circulated on or about July 18, 2016

by Representative D to **BIGELMAN** contained similar statements.

      b.     The "Course manual" sent to Manager A by Representative E on or about

August 24, 2016, included the representation in the proposed "SPEECH" to investors that

"[a]s you can probably hear by my voice, I am not British originally, I'm actually from

_____ and I moved to London \_\_\_\_ years ago to complete my Master's degree in

Economics from _____."

### *False Statements and Material Omissions Regarding Investors' Ability to Withdraw Funds from Accounts*

43.     The defendants and their co-conspirators made and caused materially false

statements and failed to disclose material information to binary options investors about investors'

ability to withdraw funds from their investment accounts.

44.     ██████, HERZOG, ████████, ALFASI, BIGELMAN, ██████, and others

trained and encouraged representatives of BinaryBook and BigOption at Yukom and elsewhere

and caused such representatives to be trained to make such misrepresentations. For example, the

"Call script" sent from Representative D to **BIGELMAN** on or about July 18, 2016 advised the

representation to investors that they "can withdraw [their] money at any point in time." The

"script" also advised the representation that the investor's money is "totally liquid—meaning, that

if for any reason you need your money back for an emergency, it's literally a click away."

45.     In fact, representatives of BinaryBook and BigOption took steps to prevent certain

investors from withdrawing funds. For example:

      a.     One tactic to prevent withdrawals was to offer investors the use of an

"Academy" session that would supposedly provide them with the skills to improve their

trading performance by explaining certain market concepts to them. In fact, the

information provided in such sessions did not materially improve investors' trading performance.

      b.      Another tactic to prevent withdrawals was to put an investor account under investigation to delay the withdrawal while representatives tried to convince the investor to cancel the withdrawal.  For example, on or about May 20, 2015, **BIGELMAN** emailed ███████ about an investor that was seeking a withdrawal and stated, "[w]e need to do what we talked about this week."  ███████ responded, "will get his account under investigation."

46.      Requests for withdrawals by investors would sometimes be granted in two situations:

      a.      Requests for withdrawals by investors would be granted in order to retain the investor with the ultimate objective of obtaining more money in the future.  For example, on or about July 4, 2016, Representative N, who worked in the "Finance Department," wrote an email to ███████ **BIGELMAN,** ███████ and other representatives about "test" withdrawals.  Representative N wrote, "it is a good thing to send [the customer] funds without applying any charges in view of getting more deposits from that [customer] in the future."

      b.      Requests for withdrawals by investors would be granted in order to prevent credit card chargebacks, because payment service providers would refuse to work with companies with high chargeback ratios.  Payment service providers were necessary for accepting credit card deposits.  Withdrawals were sent when it was determined there was a high risk of a chargeback in order to help preserve relationships with the payment service providers.  For example, on or about May 26, 2015, **BIGELMAN** explained to ███████

that he had approved a withdrawal request because "we couldn't get the CM [customer] over the phone so I guess I didn't wanted [sic] to risk with CB [chargeback]."

### False Statements and Material Omissions Regarding and the Deceptive Use of "Bonuses," "Risk Free Trades," and "Insured Trades"

47.    The defendants and their co-conspirators made and caused materially false statements and failed to disclose material information to binary options investors about the terms of and restrictions accompanying so-called "bonuses," "risk free trades," and "insured trades."

48.    The terms of "bonuses," "risk free trades," "insured trades" were not truthfully disclosed to investors in communications, and ████████, **HERZOG,** ████████, **ALFASI, BIGELMAN,** ████████, and others trained and encouraged representatives of BinaryBook and BigOption and elsewhere, and caused such representatives to be trained, to make such misrepresentations. For example:

a.    On or about July 15, 2014, ████████ attempted to give an investor a bonus, but the investor refused because he was worried it would affect his ability to withdraw his money. ████████ told the investor that "the bonus will be provided in small amounts each trade so you will be able to reach the necessary turnover right after the trade is expired" and also stated, "I guarantee that any time that you'll have bonus in your account you'll be able to withdrawal [sic] your initial investment without complicating things and no questions asked."

b.    The "Call script" circulated to ████████, **ALFASI, and BIGELMAN** by Representative B on or about February 25, 2016, advised other representatives to inform investors that "[t]he bonus is there to help us leverage the account" and that "you can always withdraw your initial investment and the profit but you cannot withdraw the bonus,

[*sic*] it is just there to help us leverage the account." This "Call script" did not include a discussion of any turnover requirement imposed by the "bonus."

      c.     The "MANY REBUTTALS" script saved in **ALFASI's** Google Drive advised representatives that they could inform investors who had a "bad experience because bonus from other companies" that "the term and the condition apply just on the bonus , not on your investment or on your profit . For example , if you invested $300 , and I added you $300 bonus ,and you traded and have another $300 profit in the account , it is mean that you have now $900 , correct ? You with me so far ? You can withdraw your $300 of investment ,and You can withdraw your $300 of the profit , but my $300 still stay in the account to keep trade with . My $300 will become liquidity as well once you will have tern over of 30 time but just on my $300 and it is not taking much time . [*sic*]" At times, investors were not allowed to withdraw their principal without meeting the bonus turnover requirement.

      d.     The "Course manual" sent to Manager A by Representative E on or about August 24, 2016, included the representation in the proposed "SPEECH" to investors that bonuses were available "to give you the highest leverage possible right from the start" and that "[t]he bonus cannot be withdrawn but the point is to make profits using a higher investment and so it should [*sic*] bother you at all, we are here for the long run right?" The "SPEECH" did not include a discussion of any turnover requirement imposed by the "bonus."

49.     "Bonuses," "risk free trades," and "insured trades" were used as a tool to impede investors' ability to withdraw funds from their accounts. ▮▮▮▮ **HERZOG,** ▮▮▮▮

20

**ALFASI, BIGELMAN,** ▓▓▓▓ and others trained and encouraged representatives of BinaryBook and BigOption at Yukom and elsewhere to engage in such misconduct. For example:

       a.    On or about April 10, 2015, Manager A emailed with **BIGELMAN,** ▓▓▓▓, and others concerning a potential withdrawal by an investor who had received a bonus. After one representative wrote that the bonus had been "removed," Manager A responded, "Put a note or add some small bonus so if the client will ask to wd [withdraw] the profit we can explain that he cant [*sic*] do it because the bonus."

       b.    On or about June 16, 2015, ▓▓▓▓ informed **BIGELMAN** that an investor seeking to withdraw "is going to get an email from support that she won 5k bonus on the account" in order to prevent the withdrawal. On or about June 22, 2015, **BIGELMAN** sent an update that "[w]e have added the bonus (this is what we spoke about)" but there had been no contact from the investor. **BIGELMAN** concluded, "We will keep on trying to get her to trade."

    50.    At the direction of **HERZOG**, the BinaryBook and BigOption terms and conditions were changed in or about December 2016 to allow account managers to place bonuses into investor accounts without notice to the investors. For example, on or about February 27, 2017, Victim G emailed BinaryBook "Customer Support" about a $10,000 bonus that was placed into her account and was preventing her from withdrawing her funds. Customer Support responded by email that "[a]ny withdrawal of funds from an account made before completing the terms of bonus will be immediately canceled and removed from the account." Victim G continued asking for her money back, replying that "I never asked for any bonus and it wasn't explained to me when it was put into my account." Customer Support again replied and described the bonus as a "present" and stated that "[w]e automatically give bonus to our important clients." Customer Support refused to

allow a withdrawal, stating that "[w]e cannot remove the bonus because you already made trades with it."

**Overt Acts in Furtherance of the Conspiracy**

51.     The defendants and their co-conspirators communicated by email and telephone with victims throughout the world and the United States, including victims in the District of Maryland.  For example:

a.      On or about August 28, 2015, Representative O emailed Victim A on behalf of BinaryBook at Victim A's Google email account regarding bank wire transfer instructions while Victim A was in the District of Maryland.

b.      On or about March 11, 2015, while in the District of Maryland, Victim B spoke by telephone with Representative P, who was working on behalf of BigOption.

c.      On or about June 15, 2016, an email was sent on behalf of BinaryBook's "Compliance Department" to Victim C at Victim C's Apple email account requesting the completion of a Deposit Confirmation Form while Victim C was in the District of Maryland.

18 U.S.C. § 1349

**COUNTS TWO THROUGH FOUR**
**(Wire Fraud)**

The Grand Jury for the District of Maryland further charges that:

52.     Paragraphs 1 through 23 and 26 through 50 are realleged and incorporated herein by reference.

53.     Beginning in or about May 2014 and continuing through in or about September 2017, the exact dates being unknown to the Grand Jury, in the District of Maryland and elsewhere, the defendants,

22

aiding and abetting and being aided and abetted by each other and others known and unknown to the Grand Jury, knowingly and with the intent to defraud, having devised and intending to devise, and willfully participated in, a scheme and artifice to defraud binary options investors in BinaryBook and BigOption and for obtaining money and property by means of materially false and fraudulent pretenses, representations and promises, transmitted and caused to be transmitted, by means of wire communication in interstate and foreign commerce, writings, signs, pictures, and sounds for the purpose of executing the scheme and artifice.

### Wires in Execution of the Scheme

54.  On or about the dates set forth below, in the District of Maryland and elsewhere, the defendants,



and others known and unknown to the Grand Jury, for the purpose of executing and attempting to execute the scheme to defraud, knowingly caused to be transmitted by means of wire communications in interstate commerce, writings, signs, signals, pictures, and sounds, to wit:

| Count | Date | Description |
|-------|------|-------------|
| 2 | On or about August 28, 2015 | Representative O emailed Victim A through interstate and foreign commerce on behalf of BinaryBook at Victim A's Google email account regarding bank wire transfer instructions while Victim A was in the District of Maryland |
| 3 | On or about March 11, 2015 | While in the District of Maryland, Victim B spoke by telephone through interstate and foreign commerce with Representative P, who was working on behalf of BigOption |

| Count | Date | Description |
|-------|------|-------------|
| 4 | On or about June 15, 2016 | An email was sent through interstate and foreign commerce on behalf of BinaryBook's "Compliance Department" to Victim C at Victim C's Apple email account requesting the completion of a Deposit Confirmation Form while Victim C was in the District of Maryland |

18 U.S.C. § 1343
18 U.S.C. § 2

## FORFEITURE ALLEGATION

The Grand Jury for the District of Maryland further finds that:

1.      Pursuant to Rule 32.2, Fed. R. Crim. P., notice is hereby given to the defendants that the United States will seek forfeiture as part of any sentence in accordance with 28 U.S.C. § 2461(c), in the event of the defendants' conviction under any of Counts One through Four of this Indictment.

2.      As a result of the offenses charged in Counts One through Four of this Indictment, the defendants,



, YOSEF HERZOG, NISSAM ALFASI, ELAD BIGELMAN,

shall forfeit to the United States, pursuant to 18 U.S.C. § 981(a)(1)(C), any property, real or personal, which constitutes or is derived from proceeds traceable to such violation.

### Substitute Assets

3.      If, as a result of any act or omission of any defendant, any proceeds subject to forfeiture:

        a.      cannot be located upon the exercise of due diligence;

        b.      have been transferred or sold to, or deposited with, a third party;

      c.      have been placed beyond the jurisdiction of the court;

      d.      have been substantially diminished in value; or

      e.      have been commingled with other property that cannot be subdivided without difficulty;

it is the intent of the United States of America, pursuant to 21 U.S.C. § 853(p), to seek forfeiture

of any other property of said defendants up to the value of the forfeitable property.

18 U.S.C. § 981
21 U.S.C. § 853(p)
28 U.S.C. § 2461(c)

ROBERT ZINK
Acting Chief
Criminal Division, Fraud Section
United States Department of Justice

ANKUSH KHARDORI, Trial Attorney
TRACEE PLOWELL, Assistant Chief

Criminal Division, Fraud Section
United States Department of Justice

A TRUE BILL:

Foreperson

Date: February 13, 2019